## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| PRISCILLA S REID, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:14-CV-3381-M (BH) |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this case was automatically referred for findings of fact and recommendation.  Before the Court is *Plaintiff's Appeal from the Decision of the Commissioner of Social Security*, filed December 24, 2014 (doc. 14).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED,** and the case should be **REMANDED** for reconsideration.

## I. BACKGROUND[2]

### A.    Procedural History

Priscilla S. Reid (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (R. at 51-66.)  On January 24, 2012, she applied for DIB, alleging disability beginning on August 1, 2010. (R. at 126, 132.)  Her claim was denied initially and upon reconsideration.  (R. at 74-78, 80-83.)  Plaintiff requested a hearing before an

---

[2] The background information is summarized from the record of the administrative proceeding, which is designated as "R."

Administrative Law Judge (ALJ) (R. at 70-71), and personally appeared and testified at a hearing

held on May 14, 2013. (R. at 7-47.)  On August 1, 2013, the ALJ issued a decision finding Plaintiff

not disabled.  (R. at 51-66.)  The Appeals Council denied her request for review on July 24, 2014,

making the ALJ's decision the final decision of the Commissioner.  (R. at 1-6.)  Plaintiff timely

appealed to the United States District Court pursuant to 42 U.S.C. § 405(g). (doc. 1.)

**B.**     **Factual History**

    **1. Age, Education, and Work Experience**

Plaintiff was born on June 24, 1976, and was 36 years old at the time of the hearing before

the ALJ. (R. at 11.)  She finished one year of community college, but did not earn a degree. (R. at

11-12.)  Plaintiff had past relevant work history as a data entry clerk, typist, administrative clerk,

general clerk, and abstractor. (R. at 64.)

    **2. Medical, Psychological, and Psychiatric Evidence**

Plaintiff first visited Edgar Nace, M.D. on June 7, 2011. (R. at 177-233.)  She reported to Dr.

Nace a history of depression that began in her childhood, therapy, suicidal thoughts, and medical

treatment for her symptoms. (R. at 186-92.)  She was not on any medications at that time, so Dr.

Nace prescribed Venlafaxine. (*Id*.)

On June 27, 2011, Plaintiff returned to Dr. Nace. (R. at 188-89.)  He noted her attitude

towards things as a "waste of time" and statements such as, "I don't get happy or hopeful", and

"there is nothing that has been worth living for." (R. at 188.)  Dr. Nace increased her dosage of

Venlafaxine. (*Id*.)

On July 11, 2011, Plaintiff saw Dr. Nace, and he noted that although Plaintiff had initially

responded to Venlafaxine, she reported feeling a lot worse the past several days. (R. at 187.)  She

expressed negative feelings and a lack of hope. (*Id.*) Dr. Nace encouraged Plaintiff to get exercise and increased her Venlafaxine prescription. (*Id.*)

Plaintiff met with Dr. Nace on July 18, 2011. (*Id.*) He noted that Plaintiff seemed more positive and conversational at their appointment, but she had a fear of getting a job where she would be observed and preferred to work alone. (*Id.*) Dr. Nace coached Plaintiff to back away from her tendency to compare herself to others and prescribed Deplin. (*Id.*)

On August 8, 2011, Dr. Nace assessed the severity of Plaintiff's depressive symptoms using several diagnostic tools, including the Beck Depression Inventory, the Liebowitz Social Anxiety Scale, the Inventory of Depressive Symptomatology, the Drug Abuse Screening Test, the Beck Anxiety Inventory, the Adverse Childhood Experience Study, the Michigan Alcoholism Screening Test, the Mood Disorder Questionnaire, and the Padua Inventory. (R. at 187, 213-15, 220-23, 226-33.) Plaintiff scored a 34 on the Beck Depression Inventory, and it showed that she experienced feelings of sadness, unhappiness, guilt, failure, dissatisfaction, and self hatred. (R. at 219-220.) Plaintiff scored a 15 out of 24 on the Liebowitz Social Anxiety Scale, with reported fear or anxiety when she went out in public or met new people. (R. at 225.) Plaintiff usually avoided these situations. (*Id.*) Dr. Nace continued prescribing Venlafaxine and Deplin and added Abilify. (R. at 187.) He also noted Plaintiff's optimism for potential employment, and he recommended that she see an OB/GYN because she had not had an exam in at least two years and had no libido. (R. at 187.)

On August 29, 2011, Plaintiff had an appointment with Dr. Nace. (*Id.*) Dr. Nace noted that she no longer had suicidal feelings but continued to have thoughts of discouragement, especially related to employment and money. (*Id.*) He recommended cognitive techniques and explained electroconvulsive therapy (ECT), and Plaintiff expressed her interest in it. (*Id.*) He also continued

her prescriptions for Deplin, Venlafaxine, and Abilify. (*Id.*)  Dr. Nace noted Plaintiff's erratic sleeping patterns and encouraged her to take steps to reset her sleep cycle. (*Id.*)

On October 3, 2011, Dr. Nace noted that Plaintiff had stopped using Deplin due to the cost of the drug, but that she continued to use the Venlafaxine and Abilify. (*Id.*)  He also added a prescription of Buspirone. (*Id.*)  He noted that her mood seemed better. (*Id.*)  Plaintiff reported she had continued to look for work and had been more helpful to her boyfriend. (*Id.*)  Dr. Nace encouraged Plaintiff to try counseling at the Pastoral Counseling Center or Jewish Family Services to address her negative self-talk.[3] (*Id.*)

On October 31, 2011, Plaintiff again met with Dr. Nace and reported that she had been worse the prior two weeks.  (R. at 186.)  Dr. Nace noted that she was not suicidal at the time of the appointment.  (*Id.*)  Plaintiff reported problems at the motel where she was living with her boyfriend and cried a lot during the appointment, but she did not want to go to counseling. (*Id.*)  She said she was interested in having a surgeon harvest her organs, so that they could be given to healthy people. (*Id.*)  Dr. Nace added a prescription of Geodon and again discussed ECT. (*Id.*)

Plaintiff met with Dr. Nace on November 8, 2011, and reported "feeling better".  (*Id.*)  Dr. Nace explored possible manic symptoms but did not find any, and he continued her medication. (*Id.*)

On November 21, 2011, Plaintiff met with Dr. Nace. (*Id.*) He cut her Velafaxine medication, but added a prescription for Pristiq. (*Id.*)

After Dr. Nace referred her to UT Southwestern Medical Center for possible admittance into a research study, on November 28, 2011, Plaintiff had a research study consultation with Mustafa

---

[3] Nothing in the record reflects that Plaintiff tried counseling with either Pastoral Counseling Center, Jewish Family Services, or any other counselor.

M. Husain, M.D., and Paige L. Baker, M.D. (R. at 254-57.)  Dr. Husain and Dr. Baker noted that Plaintiff appeared articulate, properly groomed with good hygiene, cooperative, and friendly. (R. at 256.)  They further noted that she had good eye contact, judgment, and insight. (*Id*.)  Dr. Husain and Dr. Baker discussed various neurostimulation treatment options with her and recommended that she enroll in the transcranial magnetic stimulation study. (*Id*. at 257.)  Plaintiff discontinued all antidepressants for the study and began to participate in the study, but she stopped participation after less than two weeks. (R. at 186.)

On January 23, 2012, Plaintiff saw Dr. Nace. (*Id*.)  He prescribed Venlafaxine and Eskalith. (*Id*.)  Dr. Nace noted that she was not completely suicidal at the time of her appointment, but reported being suicidal the week before. (*Id*.)  He recommended that Plaintiff try to address some of her issues and suggested that she try to get into crafts. (*Id.*)

On May 4, 2012, Plaintiff met with J. Lawrence Muirhead, Ph.D., for a diagnostic interview and mental status exam. (R. at 283.)  Dr. Murihead noted that she presented as a casually dressed Caucasian female with good hygiene. (R. at 284.)  He further noted that she was depressed and tearful during the initial portion of the interview, and that she "made exaggerated statements of distress, including, 'I'm afraid of living.  Everything depresses me.'" (*Id*.)  Dr. Muirhead noted that Plaintiff's thought processes were relevant and goal directed, and that she had no difficulty remaining topic oriented. (R. at 285.)  He diagnosed her with a dysthymic disorder and avoidant personality disorder. (*Id*.)  Dr. Muirhead opined that Plaintiff was able to manage benefit payments in her own interest and that she could understand the meaning of filing for benefits. (R. at 282.)

On May 16, 2012, Plaintiff saw Robert Gilliland, M.D., in order to receive a rating of her functional limitations. (R. at 234-51.)  Dr. Gilliland noted that "Claimant can understand, remember,

carry out only simple instructions, make simple decisions, attend and concentrate for significant periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work settings." (R. at 250.)  He concluded that she had dysthymic disorder and avoidant personality disorder, but found that the objective evidence in the file did not support her reported limitations.  (R. at 237, 241, 246.)  Dr. Gilliland noted that Plaintiff could understand, remember, and carry out only simple instructions. (R. at 250.)  He also noted that Plaintiff could make simple decisions, attend and concentrate for significant periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work settings. (*Id.*)

Plaintiff met with Dr. Nace on June 19, 2012, and reported that she had been off her medication for a couple of months.  (R. at 268.)  He prescribed her Pristiq and gave her some samples. (*Id.*)

Plaintiff saw Dr. Nace on July 20, 2012, and reported that she had spent three days in bed after she was denied Social Security benefits and felt very suicidal. (*Id.*)  Dr. Nace prescribed Citalpram and Lithium Carbonate.  (*Id.*)

On August 23, 2012, Dr. Nace administered a Suicide Risk Assessment Scale and concluded that Plaintiff had a high overall risk. (R. at 270.)

On September 10, 2012, Dr. Nace met with Plaintiff. (R. at 268.)  He noted that she was doing fairly well and not suicidal at that time, and he continued her medication. (*Id.*)

Dr. Nace saw Plaintiff on October 15, 2012. (*Id.*)  He noted that she remained stable but was fragile overall.  (*Id.*)  He continued her medication and encouraged her to be more active.  (*Id.*)

On February 4, 2013, Dr. Nace met with Plaintiff and continued her medical treatment. (*Id.*)

On March 19, 2013, Plaintiff saw Dr. Nace. (R. at 269.)  He noted that she had stopped

taking her medications regularly and was very depressed. (*Id.*)

On March 23, 2013, Dr. Nace completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). (R. at 279-81.)  He rated Plaintiff's ability to deal with the public, deal with work stress, and maintain attention/concentration at work as poor.[4] (R. at 279.)  He also rated her ability relate to co-workers, use judgment, interact with supervisor, and function independently as fair, and follow work rules as good. (*Id.*)  Dr. Nace noted that Plaintiff's ability to understand, remember, and carry out complex job instructions was poor, but that her ability to do so with detailed but not complex job instructions was fair, and her ability to deal with simple job instructions was unlimited/very good. (R. at 280.)  Additionally, Plaintiff was easily frustrated, but her ability to behave in an emotionally stable manner was fair, and her ability to maintain personal appearance, related predictably in social situations, and demonstrate reliability was good. (*Id.*)  He also opined that Plaintiff was able to manage benefits in her own best interest. (R. at 281.)

### 3.    Hearing Testimony

On May 14, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 8.)  Plaintiff was represented by an attorney. (R. at 10.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 36 years old, 5 feet 8 inches tall, weighed 220 pounds at the last time she went to a doctor but testified she has gained weight since then, and lived with her

---

[4] The Medical Assessment of Ability to Do Work-Related Activities (Mental) provides the following definitions for how to rate Plaintiff's mental ability to perform activities:

- Unlimited or Very Good – Ability to function in this area is more than satisfactory;
- Good – Ability to function in this area is limited but satisfactory;
- Fair – Ability to function in this area is seriously limited but not precluded;
- Poor – Ability to function in this area is almost absent; and
- None – No useful ability to function in this area.

(R. at 279.)

boyfriend in a motel.  (R. at 11, 17-18.)  She was right-handed. (R. at 17.)  She had not had a driver's license since June 2010. (R. at 20.)  Plaintiff attended one year of college and was close to earning enough credit hours for an associate degree, but never completed the degree. (R. at 11.)

Plaintiff lost her most recent job at Cigna after only five months on March 19, 2010. (*Id.*) Her employment was terminated because she took more sick days than normal (i.e., at least two a month), and that while at work she would sit at her desk and uncontrollably sob between 33%-50% of the time. (R. at 26-27.)

Prior to her job at Cigna, most of her jobs were temporary and included some form of data entry. (R. at 15.)  Plaintiff worked for a title company for six months. (R. at 14.)  Her longest employment, however, was one year with Eckerd Corporation. (R. at 16.)  She also did administrative assistant work. (*Id.*)  Plaintiff had lost jobs due to companies closing and had been terminated because of her conduct at work. (R. at 27.)  She was terminated from one job when she walked out of the office in the middle of the day in tears, passed her supervisor in the parking lot, and was told by her supervisor not to bother returning. (*Id.*)

Plaintiff did not like working in cubicles because they were too low, and she felt that she was constantly being watched. (R. at 27-28.)  This caused her a great deal of anxiety, and she found it difficult to function under such conditions. (R. at 28.)

Plaintiff had lived with her boyfriend for three and a half years, and they had been in a motel since September 2009.  (R. at 18.)  He did most of the cleaning, laundry, and cooking. (R. at 20-21.) During the day, Plaintiff watched television or movies and browsed the internet or emailed people. (R. at 22-23.)  She also occasionally read books, played games with her boyfriend, and researched methods of suicide. (R. at 23, 31.)  On good days, Plaintiff spent more time during the day on her

computer. (*Id*.)   On bad days, she spent her day in bed watching television. (*Id*.)   She bathed approximately twice a month and did not change her clothes every day. (R. at 36.)   On the few occasions that she did leave her room, other people had to take her. (*See* R. at 36-37.)   Her normal sleep schedule was from 4 a.m. to 2 p.m. (R. at 24.)

Plaintiff did not answer the door if someone knocked. (R. at 36.)   People did not visit her, and she did not want them to visit because she was embarrassed of the condition of her room. (*Id*.) She had been prone to breaking things and crying out of frustration. (*Id.*)   She cried at home almost every day. (R. at 35.)   Plaintiff was also worried about money and paying for treatment. (R. at 37.)

### b.    VE's Testimony

The VE testified that Plaintiff had past relevant work as a data entry clerk (203.582-054, semi-skilled, sedentary, SVP: 4), an administrative clerk (219.362-010, semi-skilled, light, SVP: 4), abstracter (119.267-010, skilled, sedentary, SVP: 6), and general clerk (209.562-010, semi-skilled, light, SVP: 3), and that this work was consistent with the Dictionary of Occupational Titles. (R. at 41.)   The VE also testified that there are transferable skills involved in Plaintiff's work as a abstractor, including investigating legal documents, verbal recording and record keeping, document preparation, computer operations and general clerical work. (*Id*.)

The ALJ asked the VE to consider a hypothetical person of the same age, education, and work history as Plaintiff. (R. at 42.)   The hypothetical person possessed the ability to understand, remember, and carry out at least simple tasks and instructions; use judgment to make simple work related decisions; relate and respond appropriately to supervisors and co-workers, but with incidental or minimal contact with co-workers or the public; maintain attention and concentration for at least two hour increments; adapt to and deal with changes in the work settings and environments; sit,

9

stand, or walk for approximately six hours out of an eight hour day; and had no exertional or push pull limitations in the upper or lower extremities, or in the postural, manipulative, visual, communicative, or environmental. (*Id*.)   The ALJ then asked the VE to opine whether such a hypothetical person could perform Plaintiff's past relevant work. (*Id*.)   The VE testified that such a person could not perform her past relevant work because the work was distinguished by its detailed and complex cognitive skills. (*Id*.)

The VE testified, however, that Plaintiff could work as a cleaner (323.687-014, light, SVP: 2), floor waxer (381.687-034, medium, SVP: 2), or industrial cleaner sweeper (389.683-010, medium, SVP: 2).   The VE further testified that work for a cleaner, floor waxer, and industrial cleaner sweeper existed in significant numbers in the state and national economy. (R. at 42-43.)

Plaintiff's attorney asked the VE to opine the number of days per month a person within Plaintiff's past relevant work would be permitted to miss per month. (R. at 43.)  The VE testified that missing two days per month would preclude Plaintiff from performing her past relevant work. (*Id.*)  The attorney next asked the VE to opine whether the same would be true for a cleaner, floor waxer, and industrial cleaner sweeper. (*Id*.)   The VE testified that consistently missing work in an unscheduled and unplanned way would lead to disciplinary actions to improve performance or dismissal. (*Id*.)

Plaintiff's attorney then asked the VE to opine whether Plaintiff's poor abilities to deal with the public, work stress, and an ability to maintain attention and concentration would preclude her from substantial gainful work as a cleaner, floor waxer, or industrial cleaner sweeper. (R. at 45.)  The VE opined that the first two variables would not be a factor in obtaining employment, but the ability to concentrate would preclude any substantial gainful work activity. (R. at 45.)

10

C.     **ALJ's Findings**

The ALJ issued his decision denying benefits on August 1, 2013. (R. at 51-66.) At step one, he found that the Plaintiff had not been engaged in substantial gainful activity since August 1, 2010, the alleged onset date. (R. at 53.) At step two, he found that Plaintiff had two severe impairments: dysthymic disorder and avoidant personality disorder. (*Id*.) At step three, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in the regulations. (R. at 54.)

Before proceeding to step four, the ALJ determined that Plaintiff had the following residual functional capacity: stand/walk for six hours in an eight-hour workday; sit for about six hours in an eight hour workday; no limitations in pushing or pulling including the operation of foot or hand controls; no postural, manipulative, visual, communicative, or environmental limitations; from a mental standpoint, no limitations in the ability to learn, understand, remember, and carry out simple instructions and task; use judgment in making simple work-related decisions; respond and relate appropriately with supervisors and co-workers, but should have only incidental contact with the public; maintain attention and concentration for at least two-hour intervals; and adapt to and deal with simple changes in work setting and environments. (R. at 56.)

At step four, the ALJ determined that the Plaintiff was unable to perform any past relevant work. (R. at 64.) At step five, the ALJ determined that the Medical-Vocational Rules supported a finding of not disabled because Plaintiff could perform other jobs existing in significant numbers in the regional and national economy, such as cleaner, waxer, and industrial cleaner, based on the VE's testimony. (R. at 65.) Accordingly, the ALJ concluded that Plaintiff was not disabled as the term is defined under the Social Security Act, before or after August 1, 2010 through the date of the  date

of the ALJ's decision. (R. at 66.)

## II.  ANALYSIS

A.     <u>Legal Standards</u>

1.     **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*.  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See*

*id.* at 436 and n.1.

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).   Under the first four steps of the analysis, the burden lies with the claimant to prove disability.   *Leggett*, 67 F.3d at 564.   The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.   *Id.*   Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.   *Greenspan*, 38 F.3d at 236.   This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.   *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).   After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work.   *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).   "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."   *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**   **Issues for Review**

Plaintiff presents two issues for review:

1.    Did the Administrative Law Judge give proper consideration to medical opinion evidence in reaching his residual functional capacity (RFC) determination?

2.    Did the Defendant Commissioner evaluate all of the Plaintiff's significant functional limitations in determining Plaintiff's RFC?

**C.**   **Issue One: Proper Consideration of Medical Opinion**

Plaintiff contends that the ALJ erred by failing to give proper consideration to the opinion of her treating physician when determining her RFC. (doc. 14 at 9.)

14

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). The relevant policy interpretation regarding the RFC determination states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and

severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the

medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458. "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted) Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, before proceeding to step four, the ALJ determined that Plaintiff had the physical RFC

to perform the full range of exertional work without lifting or carrying restrictions.  He found that from a mental standpoint, Plaintiff had no limitations in the ability to learn, understand, remember, and carry out simple instructions and task; use judgment in making simple work-related decisions; respond and relate appropriately with supervisors and co-workers, but should have only incidental contact with the public; maintain attention and concentration for at least two-hour intervals; and adapt to and deal with simple changes in work setting and environments. (R. at 56.)

The ALJ noted some inconsistencies between his observations, the medical records, and Plaintiff's own testimony. (R. at 62.) He noted that all the medical records stated that she seemed well groomed, which was inconsistent with her own reports that she only bathed twice a month and did not frequently change her clothing. (R. at 60.) He also noted that while she reported being unable to get out of bed most days, she was able to attend her appointments with Dr. Nace without difficulty. (*Id.*) He also made note of her other claims that she was fired from her last job due to depression and crying uncontrollably, that she used more sick days than allowed, that she cried almost everyday, that she never went anywhere alone, that she did not change clothes everyday, and that she did not answer the door. (R. at 59.)  He also considered his own observations that she was able to answer his questions and did not have any expressions of pain on her face. (R. at 60.)  He noted her allegations of pain, but did not find them credible. (R. at 62.)

The ALJ found that to the extent that Dr. Nace could be considered a treating doctor, his reports regarding the nature and severity of Plaintiff's impairments could not be given controlling weight for five reasons:

> (1) they did not meet the requirements of SSR 96-2p and were not "consistent with the preponderance of the objective material and other evidence of record";
> (2) he had not recommended hospitalization or other placement due to the severity of

18

Plaintiff's mental condition;

(3) his opinions/conclusions were inconsistent with "the treating doctor's own findings or opinions" in other parts of his reports;

(4) his entries on the forms did not state "the objective or sufficiently explanatory bases or factors that support[ed] his opinions/conclusions", as the form plainly required him to do, detracted from the form's probative value; and

(5) his opinions/conclusions are on issues reserved to the Commissioner.

(*See* R. at 62-63.)

Dr. Nace qualified as a treating source because he treated Plaintiff and maintained an ongoing relationship with her for over two years, during which he administered several diagnostic tests. *See* 20 C.F.R. § 404.1502; (R. at 187, 213-215, 220-23, 226-33).  Dr. Nace noted that Plaintiff was depressed, suffered from anxiety, had a history of suicidal thoughts, and had poor concentration. (*See* R. at 186-92, 268-69, 279-281.)  Dr. Nace found that Plaintiff's ability to deal with the public, deal with work stress, and maintain attention/concentration at work was almost absent. (R. at 279.)  Also, Dr. Nace's treatment notes also reflect that Plaintiff was depressed and a high risk for suicide, and that medical treatments only had limited success.

The ALJ did not identify any first-hand medical evidence obtained by examining physicians that conflicted with Dr. Nace's medical observations or test results.  Rather, he appears to have given greater weight to his own personal observations and  general disbelief of Plaintiff.  (*See* R. at 60.)[5] The conflicts in the record he identified are not apparent. (*See* R. at 59.)[6]  Moreover, Dr. Nace's

_____

[5] "During the claimant's testimony, I closely observed claimant's demeanor and behavior, responses and manner of responses to questions, facial expressions and body dynamics, reactions in and to the hearing proceedings, and entrance and exit. . . . She walked on her own power into the hearing room and sat down without difficulty and would any expression of pain on her face. She answered my questions and her representative's questions without any trouble." (R. at 60.)

[6] The ALJ "note[d] the following conflicts: she stated that she does not have the energy or interest in maintaining her hygiene, but her medical records indicate she has been appropriately dressed and groomed without any indication she was unkempt; she indicates that she cannot get out of bed, but she had made her doctor's appointments without difficulty and sent lengthy, detailed e-mails to her treating source; and the claimant has alleged

findings of depression were consistent with those of Dr. Husain, Dr. Baker, Dr. Gilliland, and Dr.

Muirhead.  These doctors are considered examining physicians because they all met with Plaintiff

and based their opinions those examinations. *See* 20 C.F.R. § 404.1502.  Dr. Husain and Dr. Baker

noted in their Research Study Consultation report that Plaintiff's history was "consistent" with her

past diagnosis of a Major Depressive Disorder, recurrent, moderate-severe, atypical subtype without

evidence of psychotic features. (R. at 276.)  Also, Dr. Glliland and Dr. Muirhead both diagnosed

Plaintiff with dysthymic disorder and avoidant personality disorder. (R. at 237, 241, 285.)  A

dysthymic disorder is a "chronic mood disturbance involving either a depressed state or a loss of

interest or pleasure in almost all usual activities." *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir.

1986); *accord Henderson v. Sullivan*, 930 F.2d 19, 20 n.2 (8th Cir. 1991); *see also Freeman v.

Stephens*, No. 12–3784, 2014 WL 7345737, at *8 (S.D. Tex. Dec. 22, 2014).

Since the ALJ did not give controlling weight to Dr. Nace's medical opinions, and he did

not rely on or identify any competing first hand medical evidence from a treating or examining

physician controverting those opinions, he was required to perform the six-factor analysis outlined

in 20 C.F.R. § 404.1527(c)(1)–(6).  He did not specifically perform that analysis, but only noted

some inconsistencies between his observations, the medical records, and Plaintiff's own testimony.

(*See* R. at 62.)  The ALJ's failure to consider all of the evidence from Plaintiff's treating source and

failure to present good cause for rejecting his opinions was error. *See Newton*, 209 F.3d at 455–58;

*see also Loza*, 219 F.3d at 393 (holding that an "ALJ must consider all the record evidence and

---

that medication has not helped her, but her records indicate otherwise with her periods of symptom exaggeration occurring after months of medical noncompliance." (R. at 59.)  The record reflects that Plaintiff had good days and bad days; showered approximately twice a month, which is the number of times she generally met with doctors per month; used her computer at home, even when anxiety and depression kept her from leaving her home; and that her boyfriend usually took her to doctors' appointments.  (*See* R. at 23, 33, 35-37, 186-92.)

cannot 'pick and choose' only the evidence that supports his position").

The ALJ's failure to apply the correct standard in considering the opinions of Dr. Nace was a legal error, not a procedural error. *See Waters v. Massanari,* No. 4:00–CV–1656–Y, 2001 WL 1143149, at *11 (N.D. Tex. Sept. 24, 2001) (finding that the ALJ had committed legal error when he improperly evaluated the opinions of a treating physician). The Fifth Circuit left the lower courts no discretion to determine whether a legal error is harmless. *Stone v. Heckler*, 752 F.2d 1099, 1106 (5th Cir. 1985) ("Unless the correct standard is used, the claim must be remanded to the Secretary for reconsideration."). Given the ALJ's legal error, this case should be remanded with directions to apply the correct legal standard as set forth in *Newton. See, e.g.*, *Beasley v. Barnhart*, 191 F. App'x 331, 336 (5th Cir. 2006) (per curiam); *Locke v. Massanari*, 285 F. Supp. 2d 784, 404 (S.D. Tex. 2001).[7]

## III. RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** to the Commissioner for reconsideration.

**SO ORDERED** on this 10th day of September, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[7] Because the ALJ committed legal error in considering the opinion of the treating physician when determining Plaintiff's RFC, and that error affects the determination of the second issue concerning the RFC assessment, the second issue is not addressed.

**INSTRUCTIONS FOR SERVICE AND
<u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE